**MONSANTO CHEMICAL COMPANY,**
Plaintiff,

v.

**A. J. GRANDBUSH, Trustee, et al.,**
Defendants.

Civ. A. 713.

United States District Court
W. D. Arkansas,
El Dorado Division.

June 4, 1958.

Lamar Smead, Camden, Ark., pro se.

Harry Crumpler, Magnolia, Ark., pro se.

McMillan & McMillan, Arkadelphia, Ark., pro se.

W. H. Kitchens, Jr., Magnolia, Ark., pro se.

Brown & Compton, El Dorado, Ark., for A. J. and Al Grandbush.

JOHN E. MILLER, District Judge.

This case is before the Court upon certain objections filed by interested parties to the Master's Interim Report No. 4 and the Master's Report No. 5.

As originally instituted in this Court, the case was an interpleader action by plaintiff, Monsanto Chemical Co. (hereinafter referred to as Monsanto), against a large number of defendants, the purpose of the action being to determine the ownership of a large sum of money representing oil purchases made by Monsanto from four leases designated as the Smith lease, Taylor lease, Reynolds-Berg lease, and Reynolds Bros. lease. In view of the complexity of the issues in the case the Court on December 4, 1956, appointed a Special Master to hear the evidence of the parties upon all issues in the case. The Master was particularly directed "to determine the amount due, if any, from the plaintiff to each of the defendants, and the amount due each intervenor, if any, from the various defendants, insofar as the funds now in the Registry of the Court, or that may hereafter be deposited in said Registry, are concerned."

The Master assumed his duties, and on April 12, 1957, filed his Interim Report No. 1, setting out the amount of money then in the Registry of the Court and recommending that the Court pay $20,374.03 to six parties out of said funds. On the same date the Court entered an order in accordance with the Master's recommendation, and no objection has been made by any party to said report or order.

On April 19, 1957, the Master filed his Interim Report No. 2, in which he determined the amount due 114 of the parties, and recommended payment thereof out of the funds in the Registry of the Court. On April 19, 1957, the Court entered an order confirming the Master's Report and ordering distribution of $223,825.91 in accordance therewith. No party has objected to this report or order.

The Master's Interim Report No. 3, filed August 23, 1957, relates to a controversy between the defendant, Dr. J. A. Brooks (hereinafter referred to as Brooks), and the defendants, Al Grandbush and A. J. Grandbush (hereinafter referred to as the Grandbushes). This report was rendered moot by a settlement between Brooks and the Grandbushes, and the Court took no action on the Master's Interim Report No. 3.

The Master's Interim Report No. 4, dated February 3, 1958, relates to a controversy between the Grandbushes and A. O. Shepherd and his assignees with respect to a variable overriding royalty interest in the Smith lease, as well as to several other matters. On February 4, 1958, the Court entered an order approving the Master's Report as to all matters except the controversy between the Grandbushes and Shepherd, and the Court allowed the Grandbushes ten days in which to file written objections to the Master's Report. Such objections were filed by the Grandbushes, and this is one of the matters now before the Court for determination.

On February 12, 1958, the Master filed his Report No. 5, relating to attorneys' fees to be allowed the law firm of McMillan and McMillan (who had represented Brooks until Brooks settled his controversy with the Grandbushes without the knowledge or consent of the McMillan firm); W. H. Kitchens, Jr., (who had represented Brooks with respect to

the Taylor lease prior to the settlement) ; and Harry Crumpler and Lamar Smead (who had represented the Grandbushes prior to the settlement). The Master recommended a fee of $25,000 for the firm of McMillan and McMillan, and a fee of $5,000 for W. H. Kitchens, Jr. The Master further found that Mr. Crumpler and Mr. Smead had a contract with the Grandbushes for a fee of $15,-000; that another party had paid or agreed to pay all of this fee except $1,-218.75; and that said amount of $1,-218.75 is still due Crumpler and Smead by the Grandbushes. The Master further recommended that judgments in favor of said attorneys be entered against the Grandbushes in the above stated amounts, together with expenses of $748.84 incurred by the McMillan firm and expenses of $350 incurred by W. H. Kitchens, Jr. The Master recommended that these three judgments be declared liens, of equal priority, against all right, title, and interest of Brooks or the Grandbushes in the Taylor, Smith, Reynolds Bros., and Reynolds-Berg leases.

On February 12, 1958, the Court entered an order allowing the Master an additional fee of $3,000 (he had previously been allowed a total of $5,000) for his services, and the order further provided that the Master "shall have a lien on any and all funds now in the hands or hereafter received by any pipeline company or purchaser of the oil runs from any of the leases herein involved." The Court allowed Crumpler and Smead a fee of $1,218.75 against the Grandbushes, and gave them a lien upon all right, title, and interest, including all oil and gas runs purchased by and still in the hands of any pipeline company to the credit of Brooks or the Grandbushes, upon the Taylor, Smith, Reynolds Bros., and Reynolds-Berg leases. The Court deferred action on the remainder of the report to give Brooks and the Grandbushes an opportunity to file objections to said report. McMillan and McMillan objected to the Master's Report No. 5 because it did not specifically create a

lien against the interest of Brooks and the Grandbushes in the lands as well as in the oil and gas runs. The Grandbushes filed objections to the Master's Report No. 5 on the ground that the attorneys' fees allowed McMillan and McMillan and Kitchens were excessive, and on the further ground that none of the fees should be declared a lien upon the Grandbushes' property.

On May 23, 1958, the Court conducted a hearing on the objections to the Master's Reports Nos. 4 and 5, and at the conclusion of the hearing took the case under advisement to give the Court an opportunity to give full consideration to the entire record before passing upon the objections.

### Objections to the Master's Interim Report No. 4

These objections relate to the disposition of certain monies in the Registry of the Court resulting from a variable overriding royalty provision in connection with the Smith lease. On July 9, 1955, Raymond E. Smith and wife assigned to A. O. Shepherd a full $7/8$ths leasehold working interest in the Smith lease as to formations below "2,200 feet subsurface". The assignment further provided that Shepherd would pay to Smith as an excess, or overriding royalty, the equal $1/8$th part and portion of the oil produced and saved from the formations covered by the assignment when the daily average production per well per calendar month from said formations equaled or exceeded 50 barrels; that when the daily average production per well per month was less than 50 barrels, Shepherd was obligated to pay the equal $1/16$th part of the oil produced, and when the daily average production per well per month was less than 20 barrels, the assignee was required to pay Smith the equal $1/32$nd part of the oil produced from the formations covered by the assignment.

On August 1, 1955, Shepherd assigned to A. J. Grandbush, Trustee, 52 percent of $7/8$ths of all the oil, gas and other

minerals that might be produced from the Smith lease, above referred to. The lease specifically provides that:

> "It is mutually agreed that A. J. Grandbush will have (52%) fifty-two percent of $\frac{7}{8}$th interest in all wells drilled and produced by him on the above acreage and any and all overrides are to be taken from interests other than the assignee herein."

Production has been less than 50 barrels daily per month per well, and there is now in the Registry of the Court the sum of $1,113.61, representing the difference between a full $\frac{1}{8}$th interest and the amount actually paid Smith under the variable overriding royalty provision by reason of the small amount of production. The question before the Court is whether this entire sum should be paid to A. O. Shepherd and his assignees or whether the Grandbushes are entitled to 52 percent of said sum.

When the two leases are construed together, the Court is of the opinion that the assignment from Shepherd to Grandbush gives the latter no interest in the variable overriding royalty provision, or in the money now in the Registry of the Court resulting from the operation of said provision. This is particularly true since the 48 percent of the lease reserved by Shepherd in his assignment to Grandbush is specifically charged with the burden of paying the variable overriding royalty due Smith.

Therefore, an order should be entered overruling the Grandbushes' objections to the Master's Interim Report No. 4, and adopting and confirming said report in its entirety. The order should further direct the Clerk to issue voucher or check in the sum of $1,113.61 payable to H. W. McMillan, attorney for A. O. Shepherd and his assignees, and mail said voucher or check to the Special Master, who will forward it to Mr. McMillan.

### Objections to Master's Report No. 5

The objections to the Master's Report No. 5 relate to the amount of the attorneys' fees to be allowed McMillan and McMillan (since H. W. McMillan seems to have handled the matter in its entirety, the Court for the most part will refer to him as being the attorney involved) and W. H. Kitchens, Jr., and to the further question of whether said fees, as well as the fees of Lamar Smead and Harry Crumpler should be declared liens upon the interest of the Grandbushes in the Smith, Taylor, Reynolds Bros., and Reynolds-Berg leases.

The Court will first consider the objections of the Grandbushes to the amount of the attorneys' fees allowed McMillan and Kitchens. In this connection, the Arkansas attorney's lien statute, Sec. 25-301, Ark.Stats., among other things provides that an attorney "shall have a lien upon his client's cause of action, claim or counter-claim, which attaches to any settlement, verdict, report, decision, judgment or final order in his client's favor and the proceeds thereof in whosoever hands they may come; and said lien cannot be defeated and impaired by any subsequent negotiation or compromise by any parties litigant * * *."

The statute further provides that:

> "* * * the same lien herein created shall attach in favor of the attorney, solicitor or attorneys from and after the commencement of an action or special proceeding or the service upon an answer containing a counter-claim, in favor of the attorney, solicitor and counsellor who appears for and signs a pleading for his client in said action, claim or counter-claim in which said attorney, solicitor and attorneys have been employed to represent such client.

> "And in case a compromise or settlement is made by the parties litigant to the action after service of said notice by registered mail and before the filing of suit or if made after suit is filed upon said action and such compromise or settlement be made without the consent of such attorney, solicitor or counsellor at law, the court of proper jurisdic-

tion shall, upon motion, enter judgment for a reasonable fee or compensation against all of the parties to such compromise or settlement so made without such consent of such attorney, solicitor, or attorneys and the amount of such fee or compensation shall not be necessarily limited to the amount, if any, of the compromise or settlement between the parties litigant."

Section 25–302, Ark.Stats., provides:

"The court before which said action was instituted, or in which said action may be pending at the time of settlement, compromise, or verdict, upon the petition of the client or attorney, shall determine and enforce the lien created by this act [section]. [Act May 31, 1909, No. 293, § 2, p. 892; C. & M. Dig., § 629; Pope's Dig., § 669.]"

■ It is well settled that the statute is remedial in character, and must be liberally construed to effectuate the purpose sought to be accomplished. Slayton v. Russ, 205 Ark. 474, 169 S.W.2d 571, 146 A.L.R. 64.

■ It is also established that a client may dismiss or settle his cause of action without consulting his attorney, but if he does so, the attorney has a lien for his fee under the statute. Martin v. Pope, 226 Ark. 522, 290 S.W.2d 849.

■ A settlement by a client without his attorney's consent automatically entitles the attorney to a fee. In this connection, in Slayton v. Russ, supra, the court at page 477 of 205 Ark., at page 572 of 169 S.W.2d said:

"In the case at bar we are concerned with the second of these situations; and we hold that the proof of a compromise or settlement after suit is filed and without the attorney's consent constitutes, under the statute, the only prerequisite to the proper filing by the attorney of a motion to have his fee fixed. Defendant, by compromising and settling, has recognized the attorneys' absolute right to recover a fee of some amount; and the demerits of the plaintiffs' original cause of action are no defense to the motion to fix the attorneys' fee under the statute here involved."

■ The procedure for enforcing an attorney's lien may be by motion in the court where the action is pending, or may be by a separate suit in said court. Missouri Pac. Transportation Co. v. McDonald, 206 Ark. 270, 174 S.W.2d 944.

■ To be entitled to a fee under the statute the attorney does not have to show that the suit would have been successful. Hamm v. Howard, 216 Ark. 326, 225 S.W.2d 333; Holland v. Harley, 206 Ark. 244, 174 S.W.2d 567; Slayton v. Russ, supra.

■ However, the probable merits of the case may have some bearing on the amount of the fee to be allowed the attorney on a quantum meruit basis. In this connection, in St. Louis Southwestern R. Co. v. Poe, 201 Ark. 93, 96, 143 S.W.2d 879, 880, the court, in determining the amount of an attorney's fee on a quantum meruit basis, made the statement that "the case must have been one of probable liability, else a settlement for $1,000 would not have been made." See, also, discussion in Annotation, 146 A.L.R. at p. 81.

■■ The rule for determining the amount of a reasonable attorney's fee is stated in St. Louis-San Francisco Ry. Co. v. Hurst, 198 Ark. 546, 129 S.W.2d 970, 975, 122 A.L.R. 965, as follows:

"The statute in question provides for a reasonable fee for the attorney against the parties to said action and that the amount of such fee shall not necessarily be limited to the amount of compromise or settlement between the parties litigant. We think this provision of the statute in question, in providing that the fee be reasonable and not limited to the amount of the compromise or settlement, in effect, provides for a fee on a quantum meruit basis. In determining what would be a reasonable fee we take into considera-

tion the amount of time and labor involved, the skill and ability of the attorneys, and the nature and extent of the litigation.

"In 5 Am.Jur., p. 380, the textwriter lays down the following guide: 'Among other things to be considered are the importance and results of the case, the difficulties thereof, the degree of professional skill and ability required and exercised, the skill, experience, and professional standing of the attorney * * *. The value of the services of an attorney is necessarily to be determined by many considerations besides the mere time visibly employed in the conduct of a suit, although in the absence of other evidence, the court must be guided in estimating the value of attorney's services by the time or amount of labor performed as indicated by the record. Where the fee is to be contingent upon success, the magnitude of the result achieved or the doubtfulness of the case when instituted should be considered in estimating the value of the services rendered, and not the number of pleadings filed, or their length, or the number of times counsel appeared in court, or the number of hours consumed in oral argument'."

See, also, Holland v. Harley, supra; Slayton v. Russ, supra; Annotations, 56 A.L.R.2d 13, 143 A.L.R. 672.

While an attorney may testify concerning his opinion of the value of his own services, such testimony is not binding on the court. In Whetstone v. Travis, 223 Ark. 856, 859, 269 S.W.2d 320, 322, the court said:

"As we said in Shackelford v. Arkansas Baptist College, 181 Ark. 363, 26 S.W.2d 124, 125: 'Neither the trial court, nor this court on appeal, is bound by the testimony of appellant and his expert witnesses in determining the value of his services.' And, as the court said in Lilly v. Robinson Mercantile Company, 106 Ark. 571, 153 S.W. 820, 821: 'It may be conceded that the opinion of the attorney familiar with the subject was entitled to great weight, but it was not to be blindly received, but was to be intelligently examined by the court trying the case in the light of his own general knowledge of the subject of inquiry, and should control only as it was found to be reasonable; otherwise, the opinion of the witness would be substituted for the judgment of the court.'"

The lien for an attorney's fee also includes the expenses properly incurred by the attorney in prosecuting the suit. McNeill v. Percy, 201 Ark. 454, 145 S.W.2d 32.

With the above principles of law in mind, the Court must determine whether the evidence submitted to the Master will support the attorneys' fees recommended by him.

### Amount of McMillan's Attorney's Fee

Briefly stated, the testimony introduced before the Master established that in October of 1955, Dr. J. A. Brooks, a chiropractor from Ft. Worth, Texas, employed the firm of McMillan and McMillan to represent him in asserting a claim against the Grandbushes.

In December 1955, Brooks and McMillan entered into a contract under the terms of which McMillan was to receive 25 percent of all mineral interests, money or property recovered from the Grandbushes. The claim of Brooks against the Grandbushes was based upon a partnership or joint venture agreement, known as the Tiago Drilling Company, under which agreement Brooks was to receive 40 percent of the net drilling profits and any interest in the wells drilled by said company.

Dr. Brooks had previously employed W. H. Kitchens, Jr., to represent him in an action against the Grandbushes with respect to the Taylor lease, and McMillan's employment extended to all leases except the said Taylor lease. Kitchens had brought an action in the

Nevada County Chancery Court against Grandbush relative to the Taylor lease, and in January 1956, McMillan prepared and filed an amended and substituted complaint in the Nevada County case claiming an interest on behalf of Brooks in the Smith, Reynolds Bros., and Reynolds-Berg leases. Approximately three hearings were held and that case was dismissed. Then on March 15, 1956, the same suit was refiled in the Nevada Chancery Court.

On March 24, 1956, the present interpleader action was filed, and McMillan filed a claim herein on behalf of Brooks against the Grandbushes and against certain money paid into the Registry of the Court.

Since Dr. Brooks lived out of the State, it was incumbent upon McMillan to develop the evidence necessary for the trial of the claims of Brooks.

From confidential sources McMillan obtained information indicating that Don Peaker was holding a mineral interest in trust for A. J. Grandbush in the Reynolds Bros. and in the Reynolds-Berg leases. Based on this information McMillan took the discovery deposition of Peaker. McMillan also sought to get an accounting from the Grandbushes but never succeeded in getting a satisfactory accounting.

In an effort to determine the position of the parties McMillan investigated a Workmen's Compensation case which had been brought against the Tiago Drilling Company, and another action in the hope of finding additional evidence.

McMillan assisted the Master in determining the interests of the various parties in the instant suit. Finally a 17-page stipulation was entered into on April 10, 1957, concerning this matter.

On August 15, 1957, McMillan and Harry Crumpler, representing the Grandbushes, discussed the possibility of a settlement of the case. No settlement was reached.

On August 22, 1957, Brooks and Al C. Grandbush (acting for the Grandbushes), without the knowledge or consent of their attorneys, settled all disputes between them. Grandbush paid Brooks $7,000 in cash, and agreed to and did relinquish claims against Brooks in approximately the sum of $8,600. Brooks released and discharged the Grandbushes from any and all liability arising out of the alleged partnership or joint venture agreement and assigned to the Grandbushes all his right, title, and interest in any and all oil and gas leases, royalties, minerals, or interests that he might have in Nevada, Ouachita, Union, and Columbia Counties in the State of Arkansas.

McMillan's employment was from October 1955 to September 1957. He did not keep a record of the time spent on the case, but a substantial amount of time was consumed.

Other factors to be considered in determining a reasonable fee include: the employment was casual rather than regular; it was a difficult case; McMillan lost the opportunity of doing other work; he is an experienced and competent attorney; the case was very important to Brooks because of his financial situation; there was a possibility of a large amount of money being involved; and the fee was contingent.

McMillan testified that in his opinion his services were worth a minimum of $25,000 and a maximum of $50,000. Dave McKay, an attorney, testified that in his opinion McMillan's services would be worth $50,000, but his opinion was based on the premise that Brooks would have recovered a minimum of $150,000.

McMillan incurred expenses in the sum of $498.84 in connection with the case and an additional expense of $250 for a Certified Public Accountant.

A review of the entire record convinces the Court that the evidence does not support the allowance of an attorney's fee in excess of the sum of $12,500 to McMillan. The Master recommended an attorney's fee of $25,000, but under Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A., the Court feels compelled to modify the Master's Report No. 5 to the extent of reducing

the fee of McMillan and McMillan from $25,000 to $12,500. The said firm is also entitled to recover its expenses in the sum of $748.84.

### Amount of Kitchens' Attorney's Fee

In September 1955, Dr. J. A. Brooks employed W. H. Kitchens, Jr., to represent him in asserting a claim against the Grandbushes in connection with the Taylor lease. On March 21, 1956, Brooks agreed to pay Kitchens a one-fourth interest in anything recovered by Brooks against the Grandbushes with respect to the Taylor lease.

Brooks paid Kitchens $250 on September 28, 1955, and $200 on October 4, 1955. No other payments were made by Brooks to Kitchens. On September 30, 1955, Kitchens filed suit on behalf of Brooks in the Nevada County Chancery Court. The case was set for trial December 5, 1955. On that date, Kitchens had a conference with Harry Crumpler, representing the Grandbushes, and they reached a tentative agreement as to a part of the controversy, leaving for determination the percentage owned by the Grandbushes in the Taylor lease and an accounting.

On April 4, 1956, Kitchens filed exceptions to the accounting in the Nevada Chancery Court at Prescott. On May 17, 1956, Kitchens filed a supplemental answer for Brooks in this Court, and on March 17, 1957, he filed an answer for Mrs. Brooks.

In the course of his work Kitchens was out of his office at least eleven days and made several trips out of town in connection with the case. His usual fee is $100 per day for work out of town, and $60 per day for work in town. The trips made by Kitchens include the dates of: September 30, 1955; December 5, 1955; January 11, 1956; February 6, 1956; February 24, 1956; September 13, 1956; November 13, 1956; January 17, 1957; March 15, 1957; August 10, 1957.

Kitchens spent approximately $225 for expenses.

The matter was settled between Brooks and the Grandbushes without Kitchens' knowledge or consent, and he is entitled to an attorney's fee against Brooks and the Grandbushes under Sec. 25–301, Ark. Stats., supra.

The Court, after considering the entire record, is convinced that the evidence does not sustain an attorney's fee on behalf of Kitchens in excess of $2,500, and under Rule 53(e) (2), F.R.C.P., the Court is convinced that the Master's Report No. 5 should be modified by reducing the fee of W. H. Kitchens, Jr., from $5,000 to $2,500.

The Master also found that Kitchens incurred total costs in the sum of $800; that he had been paid $450 by Brooks; and that he is entitled to recover a judgment in the sum of $350 for costs incurred by him. Upon reviewing the record the Court is unable to find the evidence upon which the Master based this finding. On page 292 of the transcript of the evidence presented to the Master, it appears that Kitchens testified that he spent approximately $225 for expenses out of the $450 advanced by Brooks. The Master asked Kitchens: "You concede then out of whatever fee is allowed you, Dr. Brooks is entitled to a credit of $225?" Mr. Kitchens answered: "Yes, Sir. I think that is correct." In view of this testimony of Kitchens, the Court is of the opinion that the attorney's fee of Kitchens in the sum of $2,500 should be reduced by the amount of $225, leaving the net due $2,275.

### Are the Attorneys Entitled to a Lien on the Grandbushes' Interest in the Leases?

McMillan and McMillan vigorously contend that said firm is entitled to a lien on the interst of the Grandbushes in the Smith, Taylor, Reynolds Bros., and Reynolds-Berg leases. The other attorneys, Kitchens, Crumpler, and Smead, join in this contention. Just as vigorously, however, the Grandbushes contend that there is no authority for the allowance of such a lien. The Master recommended that a lien be declared, and the Court must determine whether to ac-

cept or reject the Master's recommendation.

A reading of the attorney's lien statute in the light of the decisions interpreting it convinces the Court that the attorneys do not have a lien upon the Grandbushes' interest in the leases. The statute, Sec. 25–301, Ark.Stats., supra, has been quoted heretofore in this opinion, and for present purposes suffice it to say that the statute gives the attorney a lien "upon his client's cause of action * * * which attaches to any settlement * * * in his client's favor and the proceeds thereof in whosoever hands they may come; and said lien cannot be defeated and impaired by any subsequent negotiation or compromise by any parties litigant * * *." McMillan contends that Brooks' "cause of action" involved the interest owned by the Grandbushes in the four leases in question and that the attorney's lien should attach to the Grandbushes' interest in said leases. This contention cannot be sustained. It is true that the attorney has a lien upon his client's "cause of action", but the statute specifically spells out the items to which the lien attaches, such items being "any settlement, verdict, report, decision, judgment or final order in his client's favor." The only one of these enumerated items present in the instant case is the settlement, and the Court is of the opinion that the settlement is the only thing to which the lien could attach. In this connection, in St. Louis, I. M. & S. Ry. Co. v. Blaylock, 117 Ark. 504, 514, 175 S.W. 1170, 1173, the court said:

"The attorney, under the statutes, has a lien for his fee which cannot be defeated by any settlement of the parties litigant before or after judgment or final order. The attorney has no right to compel his client to continue litigation. A client may dismiss his cause of action or may settle with the opposite party without consulting his attorney, but where there are any proceeds resulting from the litigation, either through settlement or compromise, or as the final result of the prosecution of the lawsuit to the end, the attorney has a lien on such proceeds of which he cannot be deprived by the parties to the lawsuit by any settlement they may make. This is as far as the attorney's rights go."

And in McDonald v. Norton, 123 Ark. 473, 476, 185 S.W. 791, 792, 1199, the court said:

"Counsel for the plaintiff claimed a lien under Act 293 of the Acts of the General Assembly of 1909. Section 1 of the act reads as follows: 'The compensation of an attorney or counsellor at law for his services is governed by agreement, express or implied, which is not restrained by law. From the commencement of an action or special proceeding, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which attaches to a verdict, report, decision, judgment or final order in his client's favor and the proceeds thereof in whosoever hands they may come; and the lien can not be affected by any settlement between the parties before or after judgment or final order.' Acts of 1909, p. 892.

* * * * * *

"* * * The meaning of the section is that the attorney shall have a lien upon his client's cause of action from the commencement of the suit thereon, and if afterwards the same becomes merged in 'a verdict, report, decision, judgment, or final order in his client's favor,' such lien shall attach thereto; in other words this lien is upon the cause until merged, and then attaches to the thing into which the cause of action is merged."

In the instant case the only "settlement" in the "client's favor" and the only "proceeds thereof" were the $7,000 in cash paid by Grandbush to Brooks and the extinguishment by

Grandbush of the debt of $8,600 owed by Brooks to Grandbush. That settlement and the proceeds thereof is the only thing to which the attorneys' liens could attach, and apparently the attorneys have not been and probably will not be able to trace said proceeds effectively in order to establish a lien against said proceeds.

For the above reasons the Court is convinced that the attorneys do not have a lien upon the interest of the Grandbushes in the Smith, Taylor, Reynolds Bros., and Reynolds-Berg leases, and that the objections of the Grandbushes to that part of the Master's Report No. 5 should be sustained. The Court's order of February 12, 1958, should be modified by striking therefrom the portion of the order adjudging a lien in favor of Crumpler and Smead against the interest of the Grandbushes in the four leases. An order or judgment should be entered rejecting that part of the Master's Report which recommended the fixing of a lien in favor of the attorneys and against the interest of the Grandbushes in the four leases in question.

### Final Disposition of the Case

This case has been pending approximately 26 months, and the Court feels that no useful purpose would be served by retaining jurisdiction of the case for any longer period of time. The Master has done an excellent job of handling the case, and upon the basis of his five reports and upon the record the Court is now in a position to dispose of the case in its entirety.

In its order of February 12, 1958, the Court recited the fact that Monsanto is still purchasing oil from the Reynolds Bros. and Reynolds-Berg leases; that the interest of the Grandbushes in said leases is subject to a vendor's lien in favor of Don Peaker in the amount of $38,909.55, with interest at 6 percent per annum from October 20, 1956, on the unpaid principal; that Peaker, as of November 1, 1957, had been paid $28,962.77 on the vendor's lien. The Court ordered Monsanto to report from time to time further payments made to

Peaker on said lien, and further ordered that when the amount of the lien and interest had been paid that all future funds accruing to the interest of the Grandbushes should be held subject to further orders of the Court.

Upon further consideration the Court is convinced that there is no necessity of retaining jurisdiction solely for this purpose, especially since the Court has found that the attorneys do not have a lien on said interests, other than the lien they may have as a result of the judgments to be entered herein.

As the case now stands, Monsanto has paid into the Registry of the Court the total sum of $256,938.34, and as of November 1, 1957, had paid Peaker the sum of $28,962.77 in accordance with the orders of the Court. As of February 3, 1958, the Court had disbursed the entire amount deposited in the Registry of the Court, with the exception of the $1,113.61 relating to the Smith overriding royalty, and the $107.11 remaining in the custody of the Master for costs and expenses. The judgment entered herein will dispose of these two sums, leaving no money in the Registry of the Court in connection with this case.

In view of the status of the case the Court feels that it is unnecessary to retain jurisdiction until Monsanto has made all the payments to Peaker. On September 13, 1956, the Court entered an order discharging Monsanto from further liability to defendants as to the sum of $19,184.83, which was the amount then deposited in the Registry of the Court; the order further provided that Monsanto should be discharged from further liability to defendants for sums of money thereafter to be paid into the Registry of the Court. As above stated, Monsanto has now paid a total of $256,938.34 into the Registry of the Court, and the judgment entered herein should discharge Monsanto from further liability to all defendants as to said sum. The judgment should also provide that Monsanto automatically will be, and is, discharged from further liability to all defendants with respect to the amounts

already paid and to be paid Peaker on his vendor's lien in the principal amount of $38,909.55, with interest at 6 percent per annum from October 20, 1956, on the unpaid principal.

Therefore, the order of the Court of February 12, 1958, should be amended by striking that portion of the order requiring Monsanto to report to the Court further payments made to Peaker on said lien, and by striking that part of the order requiring Monsanto thereafter to hold future funds subject to the Court's orders. The judgment entered herein should require Monsanto to continue the payments to Peaker until the vendor's lien and interest have been paid, and Monsanto will then be free to make the payments to the party or parties then entitled to the same.[1]

 The order of February 12, 1958, allowed the Master an additional fee of $3,000 against Brooks and the Grandbushes, and further provided "that the said J. Bruce Streett have a lien on any and all funds now in the hands of or hereinafter received by any pipeline company or purchaser of the oil runs from any of the leases herein involved." Upon further consideration the Court is of the opinion that it does not have the power or authority to declare such a lien, and therefore the order of February 12, 1958, should be amended by striking that part of the order adjudging said lien. See Rule 53(a), F.R.C.P.

According to the Master's Interim Report No. 4 there remains in the bank the sum of $107.11 of the original sum of $7,708.15 set aside for payment of costs in this case. Said sum of $107.11 should be applied in payment of the additional fee allowed the Master, thus leaving the amount due the Master as against Brooks and the Grandbushes the sum of $2,892.89.

In accordance with the foregoing a final judgment should be entered granting McMillan and McMillan a judgment for attorneys' fees against Brooks and the Grandbushes in the sum of $12,500, plus costs in the amount of $748.84; granting W. H. Kitchens, Jr., a judgment for attorney's fee against Brooks and the Grandbushes in the sum of $2,275; granting Harry Crumpler and Lamar Smead a judgment for attorneys' fees against the Grandbushes in the sum of $1,218.75; granting a judgment in favor of the Master against Brooks and the Grandbushes in the sum of $2,892.89, representing the Master's fee which is a part of the costs,[2] and allowing the Master in part payment of his additional fee the sum of $107.11 remaining in the bank from the original amount set aside for costs; and providing that all four judgments shall have equal priority.

The judgment should further provide that A. O. Shepherd and his assigness are entitled to recover the sum of $1,113.61 in the Registry of the Court relating to the Smith overriding variable royalty. The judgment should also provide that Monsanto continue its payments to Peaker until the vendor's lien and interest are paid.

Finally, the judgment should provide that the Master's Report, except as herein modified, should be accepted and confirmed by the Court and that the Master should be relieved from further responsibility in the case and discharged therefrom.

A final judgment in accordance with the above is being entered today.

1. Of course, the Court realizes that when that time comes a new controversy may arise as to who is entitled to the payments. However, that contingency is not sufficient to prevent the Court from finally disposing of this case.

2. Mallonee v. Fahey, D.C.Cal., 122 F. Supp. 472.